Good afternoon, your honors. May it please the court. Dr. Carpenter's trial was tainted by multiple flawed evidentiary rulings that gave the jury a distorted and one-sided picture of the evidence against him. These rulings, together with the dismissal of a seated juror in the middle of the trial, now require a new trial. I'm happy to address the four errors that we've raised in any order that the court would like, but maybe I'll start with what we see as the cleanest and the most straightforward error and basis for reversal, which is the trial court's dismissal of juror number seven based simply on an email from her boss to the judge on the first day of trial. That ruling defies the clear text of Rule 24C1, and it also violates unambiguous precedent. When you say, I think the reply brief, when you said the prejudice rule means what the prejudice rule says, it's not immediately apparent that 24C has a prejudice rule. Right. Do you have any circuit law that would say that Rule 24 is a carve-out from the general prejudice rule of 52A? I think the way I would think about it, Your Honor, is that Rule 24 does require prejudice, and I think what the case law has said, and we cite, I think, at least seven cases from this court saying that prejudice is required, but then it says, and prejudice is found, prejudice is found when you have a situation in which the excusal of the juror is for a, quote, legally irrelevant reason, or when there's no factual support for it. So prejudice is required, but then it's not. Isn't that line of case law, which would be controlling the published opinions particularly, but I'm just wondering more conceptually, is this the only rule in the criminal rules that is a different prejudice harmlessness standard than the comprehensive rule at 52A? I'm not a, I frankly don't have a comprehensive knowledge of the rules, and so I can't say for certain whether there are other rules that have different glosses in the way this one does. Am I right, though, in the case law, courts certainly make that third propositional statement, which I guess is a presumed prejudice rule. Do you know of any circuit application of that rule to reverse a conviction as to a juror that's replaced before deliberations have begun? Yes, the Ramos case would be the best example we have of that. Where we did reverse presuming prejudice? Yes. I didn't, there was no showing or inference of inability. It was just... Well, I know in that case there was no factual support that was given, so there's sort of two grounds for this prejudice rule that would trigger the prejudice finding, and I actually think it's a finding, at least that's how the court talks about it, not a presumption, but the court says, you know, legally irrelevant reason or no factual support, and Ramos is a case in which there was no factual support, that's what the court said, and then it said therefore we must reverse, and it was clearly referring to the prejudice rule, which has been established in this court for 40 years. And remind me, it wasn't a case where they said, well, because of this mother getting surgery, army letter saying come, because of this third party incident, we're going to infer that the person would have been distracted. It was a straight, no reference to impairment at all. I think there was no factual support for the dismissal, and then the court said, you know, it didn't do an analysis of like, well, what would have happened if this juror actually had served, and so instead it said, no, we're going to apply our rule, and that means we must find prejudice, and that's what we're arguing for here. Is this a, is it a disjunctive consideration? In other words, if there's factual support for letting the jury, juror go, do we get to legally irrelevant reason? I mean, in other words, I think if, I think if you have a legally irrelevant reason that's supported by facts, that's not good enough, and if you have, if you have no facts, but you have a good reason, but no facts that would actually suggest that the reason was implicated in the case, then that wouldn't be good enough, so I think if a defendant says, it can show that there's, there's a dismissal of a juror for either a legally irrelevant reason or without any factual basis, then I think the defendant would be entitled to, to take advantage of this automatic. What if the record reveals a factual basis here, even though there's not a specific finding? I think the factual basis, uh, here would, would not amount to a legally relevant reason, because the, the, the, what's required is either, is an impairment, and the impairment, uh, you know, on the, based on the, on the, uh, text of the rule, the juror needs to be either unable to perform or disqualified to, for performing, and so there can be all the facts in the world, but if they don't add up to a juror who's unable to perform or disqualified for, for, uh, from performing, then it's not a proper dismissal. Why is this not an unable to perform case? Well, the, the judge didn't even think it was an unable to perform case, but let me give my answer, and then I just want to point to the record where the judge actually expressly, on the record, recognized that the juror was able to continue to perform. When you say able to, you know, physically able to, but the employer was desperately wanting them not to. Well, the juror . . . Is that not enough? So the, the, because the fact that the, the, her boss didn't want her to do her civic duty and, and show up for jury service . . . Oh, she had, she had a competing civic duty, in fairness. Well, in fairness, but usually, and, and the, the, the rules are clear on this, that just being a teacher does not sort of exempt you from jury service, and they're, they're, you know, the presumption is that even teachers who are public servants serve on juries. Yeah, but the defense, defense argued that all the teachers ought to have been excused. I mean, I know that's in voir dire, but, you know, your side itself raised this idea that, well, teachers should be excused because there's going to be a hardship. I've got a couple questions on the table. Let me answer that one and then pivot back to Judge Ho. So I think the difference between voir dire and trial is very important, because there are different legal standards that govern these inquiries. When do the different legal standards attach? Once you have a jury that's selected and . . . Selected? And I've probably sworn in, but I don't, I haven't thought about that question. How important is the probably? Sorry? How important is the probably? In other words, once a jury is selected . . . Then Rule 24C attaches. And certainly, when you're in the middle of questioning in voir dire, then the legal standard that's set forth on page 12 of the Northern District of Texas Jury Plan governs. And that standard is different and easier to satisfy than Rule 24C1. That standard is, you have to show undue hardship or extreme inconvenience, and I think all courts, and we certainly agree, recognize that judges have wide discretion in applying that standard at the voir dire stage. But once you get the jury in place, once the jury is in place, the Supreme Court of the United States has recognized, this is in the Chris versus Brett's case, it's not cited in the briefs, but that a criminal defendant has a protected interest in retaining a chosen jury, and that that interest has roots that are deep in the historic development of trial by jury in Anglo-American, in our Anglo-American system of justice. And so, it's different once you have a jury in place. That's at 437 U.S. 35 to 36, citing other cases. You want to switch back to Judge Ho? Yes, Judge Ho. So, you asked why this juror wasn't unable to serve. I think the reasons were the juror was asked about her ability to serve during voir dire and did not indicate that she was unable to serve. If anything, she responded or didn't raise her hand when she was asked certain questions that tested her ability to serve, including her ability to serve— Okay, but later it was clear that the employer—I'm sorry to interrupt, but it later became clear that the employer very much wanted her not to serve. True. Her boss— Why is that not enough? Well, because the bosses never want their—or rarely want their employees to be absent from the office. But here, from the juror's perspective, the juror was ready, willing, and able to serve. So, let me offer a hypothetical. Let's say I'm asked to go to a parent-teacher conference at a particular date as a parent, and I tell the school, you know what, I'd love to, but I'm unable to attend that meeting. And it turns out the reason I'm unable is because my boss needs me at work. They're not going to free me up. Have I lied to the school district? I think in that context, unable would mean something that's different from unable as in incapable of serving. I think if the school said, what are you talking about? Of course you're able to come. This is really important. You're not debilitated. You're not in the hospital. You're not taking care of an ailing parent. I think that would also be equally a reasonable thing for the school to say in response, that in fact the parent is able to come. And in this context— So, I would be a liar, though, if I told the school district I'm unable to come, would in fact, what unable means is, I can come. It's just that my boss doesn't want me to. I think in that context, which is different from this one, you would be using the word unable in a certain way in which that might be a permissible reading of that word. But under this court's case law, interpreting what inability is, it requires impairment. And if— So speaking of case law, I want to mention a case, United States v. Dubas, Dumas. Are you— I'm not familiar with that one, Your Honor. And that's fine. I don't believe it was cited by anybody. But we found it, and unfortunately, my eyesight's not helping me here. I can't see. It's D-U-M-A-S. It involves, as I understand it, an Air Force or Army, the juror's employer is the United States Army. And the United States Army apparently was not wanting the employee to show up, and the court, we, our court, found that that was enough. We're obviously bound by that precedent. Once the trial had started? I believe it was before it was formally seated, but I'm not sure it matters. Well, I think that Rule 24C— It talks about 24C, is my point. Okay. I've got to look at that case, Your Honor. Fair enough. Obviously, the government didn't cite it. I do want to go back just to lock down this inability point. I think it's really important to look at what the court itself determined, and this is at page 25413 of the record. And here's the point where the court is saying what he's decided to do with the juror. And the court says, and so you probably don't have it in front of you, but let me just repeat the page number in case you're able to look at it later. It's 25413, and says, the court makes the decision he's going to excuse the juror. And he says, but what I plan to do is not excuse her until the end of the day, because if we have some sort of medical emergency with another juror, I'd like to know as much as I can. And I think what the court is saying there is, I'm going to excuse her at the end of the day, but if something comes up where we need her to actually serve, you know, if there's an emergency with another juror and we can't excuse this one because we need to fill out our 12-person jury, she's going to continue to serve, which I think recognizes that she was not impaired. She was not unable to serve. Well, but that also presupposes that the court has no discretion to excuse or not excuse even in the case of impairment, but the standard says there's discretion in the district court, whatever that means. I don't think there's discretion if there's no impairment. And I think there you have the court, on the record, recognizing that there was no impairment because of the fact that he was willing to allow her to serve. But if a juror says, my mom's getting surgery, may I be excused, that's prejudice unless the district court says, and I think she would be distracted if we didn't let her go? Do they have to actually tie the knot? I think that it kind of depends on the facts, but the cases that the other side cites, which we have no quibble with, the Dominguez case, which itself cites a different case called Hoffa, we're 100% in agreement. If a juror has a situation where the mother, the 87-year-old mother, which is the facts of the case that they cited, is hospitalized, or you have a parent on a deathbed, then of course that juror is going to be distracted and impaired in a relevant sense. The Dumas case, you'll find it if you're wondering where the site is, it's cited in the Kiel case that you cited, K-I-E-L, both parties cited that, it cites Dumas, which is a Fifth Circuit published case about the Army sending a letter saying we need this juror to do a cite. Interestingly there, they don't find even error in the first place, so it's not even a harmlessness case. So they don't find error, they say that it was . . . It's within the discretion. It was good enough for impairment. I'll just read the language. The site is 658 F. 411, and at 413 it says, the district court was clearly satisfied that the juror who was dismissed was urgently needed by his employer and unable to serve under the terms of 24C. We find no abuse of discretion in that determination. Okay. I know it's not fair to ask you a question. I'll take a look at it and submit a 28-J letter or something if that's all right, because it wasn't cited by the other side. Here, the judge and its prejudice issue, it wasn't even sort of pushing back on our arguments about impairment. So I think . . . Counsel, if you could, before your time runs out, I want to talk about the Rule 106 issue. Yes. Is that preserved? Yes, it's absolutely . . . How so? The clearest place where we preserved it is at page 25917 of the record, and that's in the sidebar on April 4th. That's Attorney Poe. Attorney Poe is cross-examining Britt. Right. Not Haygood. That's right, but . . . Any one objection had they . . . But the objections were being made by . . . on behalf of the defense side throughout the case. They were not requiring each . . . There weren't? No. I couldn't . . . I didn't see in the brief or in the transcript where the court had formally said any objection is to one . . . I think that was widely understood, Your Honor, because I think that would . . . it would have made it for a much more . . . So there was no . . . there was no denial of 106 interjected during the government's the snippet. So it would have been, as the commentary allows, the 106 effort during the cross of the government witness, Britt. Right. So when we were crossing Britt, exactly. When the defense . . . When the defense was . . . would you agree, though? It looked like he got his question about the payments out. I think he got . . . The next question is more about were the investigators trying to pit us against each other. Government objection, hearsay, big sidebar does bring up rule of completeness.  But then doesn't pose . . . the next question is, okay, then we'll go clip. Can I try to give you my . . . Yeah, break that down. So I think you're absolutely right. On page 25915, the question is asked once, are you . . . you know, Jerry is multiple times denying ever paying Dr. Carpenter. Isn't that right? So he asked the question once. Then there's another question. The government objects to that question. It's sustained. Then a defense counsel says, can we have a sidebar? And the reason for the sidebar was not to kind of talk quibble about the previous objection. Rather, it was to explain what he was going to do next. And what he says is, I'm trying to avoid under the rule of optional completeness offering in this entire two-hour tape. So I'm just trying to get through some questions, questions plural. I mean, otherwise we can do it in a couple minutes or do it in two hours. But was there ever a motion to admit it or a request to admit the transcript or anything like that? He says there that he wants to ask more questions. And then the judge says, you know, tell us why this . . . and then there's a fight about optional completeness, Rule 106. And the judge says, well, tell us, you know, tell us more. Give us more detail. And then on the next page, he explains what he's going to get into with these additional questions. And he says, and then you've got multiple denials on the part of Jerry Herillic about ever paying Dr. Carpenter. But they, the government, want to offer a single snippet during the . . . and then he's interrupted by the judge who says, no, no, no, that's hearsay. And so I think it's pretty clear that he hadn't moved on. I mean, he had moved on with, in terms of going to another question, but he hadn't, he hadn't stopped asking questions about the denials. And we know that because in the sidebar, he says, I want to keep talking about these multiple denials. And the court cuts him off and he says, no, you can't do that. But he elicits twice from Britt that Jerry denied that Carpenter got the money. I think he elicited it only once before the sidebar. And then he was told he couldn't ask additional questions about it in the sidebar. And then later he asked a question that refers back in one fleeting place a couple pages later to it, but he doesn't get into the detail. Why? Because he knows the judge has told him he can't. And Haygood gets up and Haygood starts crossing. Right. And then at that point, that's . . . And then they sort of agree, well, the tape's going to say what the tape says, because I don't think there's any corroboration for the $8,000. I, I don't think that, I, I don't, I'm not sure which part of the cross you're talking about. The final recross, I think they come to an agreement that we're not sure the full tape discloses anything that would corroborate that Jerry was paid $8,000. I think they, there might've been questioning along those lines, but what, what you didn't hear was 15 times, which is what they could have done if they had had the ability to walk through the 15 denials to counteract the government's distract, uh, you know, misleading snippet. And then what does the government do? They come back in their closing argument and they take advantage of the fact that they've been able to sneak in this one snippet. And what they say, this is at page two, seven, five, one, three. So closing argument, really important point the government's making here. They say, Jerry Huralik admits in the recording when he thinks no one but Britt Huralik is listening that he paid Dr. Carpenter. But Haygood wasn't very restricted, right? He gets up and says, you heard the uncle denied it. The government's cherry picking one snippet. Where's the money? Where's the corroboration? But it's, it's one thing to be able to say that. It's another thing to be able to back it up with the 15 places. I mean, this was a 15 to one situation and this was like wildly misleading. Why don't we hear from the government? You've reserved your full rebuttal time. Thank you, your honors. Good afternoon, your honors. May it please the court, Josh Handel for the United States. I'll jump right in on the rule 106 issue. Before you do, the Halak family is sort of a wrecking ball when it comes to health care fraud. Would you agree? They've testified multiple times against doctors. They were in their Grau case that we issued a published opinion, correct? Yes. Am I right that every single time these two brothers, the family that's bilking the veterans of millions and millions of dollars are getting less time than the doctors? In this case, a doctor who may or may not have gotten only $8,000? Your honor, I don't know the answer to that. Did the two brothers, Britt and Matt, get less time than Dr. Carpenter? I believe they did. Yes, Dr. Carpenter was sentenced to 45 months and they had five-year stat maxes and I believe they were sentenced below that because of the 5K reduction. I mean, I'm asking this because doesn't it go to how critical it was for the government to be able to stand up in closing and say, in this case, it's about money. Dr. Carpenter got money. But, you know, the record seems to bear out that when we look at this tape, Jerry is almost always denying he gave any money to Dr. Carpenter and when Attorney Poe says, I want to elicit that, the government jumps up and says, hearsay. Well, respectfully, your honor, I would disagree with that characterization. I think that this case can be about money even if not every single co-conspirator profited to the same degree. I mean, what we're talking about here... In terms of the elements, yes, but his whole defense was he was helping out military veterans. He wasn't, like Britt and Matt, making millions and millions of dollars. I mean, let me ask just factually, does the government have any evidence in this record that he made anything more than $8,000? No, we don't, your honor. His whole case is about the $8,000 and therefore, for them to elicit that the uncle repeatedly said he didn't give him that $8,000, it's pretty central to whether or not the jury would find him guilty. Well, again, respectfully, your honor, I don't think the whole case is about the $8,000 that Carpenter received. Well, you had to show he agreed to join the conspiracy. Yes, we have to show that he agreed. He made no money. That would really throw it down. I guess I'm asking you this because maybe I should phrase it more appropriately for you. Do you agree that the government was legally in error when it interjected and said hearsay to block the 106 remainder? Just the legal point, not procedural default, not harmlessness. No, on the objection that the government made, the government... A hearsay objection. Is hearsay a proper objection to 106 remainder or not? Yes. Hearsay remains a proper objection to a 106 effort to get in additional completing statements. How can you assert that with both Portillo and Herman, which you know I'm very familiar with, or actually the language of Rule 24 now? 106. Right. I think the government, the trial AUSA offered the clearest explanation and that's at doesn't just kick open the barnyard door to any and all self-serving hearsay the defendant wants to admit. Rather, the rule, quote, only applies if it's necessary context and then everything else is self-serving hearsay. But there's really not... I'm sorry to interrupt, but the problem is that's exactly what the trial judge did in trial. There's no development of this argument along the lines of what you're saying. The judge just says, it's hearsay, circuit precedent, and we got to follow the circuit precedent. It stays out. Well, that's not right, is it? I mean, in other words, you have to flesh out that it's connected to complete the statement that's at issue or that it's admissible for some other valid reason under Rule 106. So I think, you know, candidly, it's not entirely clear to me what was going through the district judge's mind at that point. And part of that is because this was not teed up properly. I mean, there were not robust arguments about this, citations to circuit authority, anything like that. Well, this is a hinge issue in the case. I was going to ask this to build on Judge Higginson's question. $8,000, no $8,000, money, no money, whatever the elements of the claim are. Is there any other evidence in the record that Dr. Carpenter was paid anything other than the snippet that the government used? I mean, there's testimony from Brett and Matt. Well, they couldn't say what happened to the money. They said they gave their uncle $8,000. But as far as connecting the actual transfer from Jerry to Dr. Carpenter? Sure. So we don't have, you know, a financial transaction. Is that it? Is that it? It's the statement from the recorded interview and also the statements from Brett and Matt that they paid money or that Brett specifically paid money to Jerry to give to Carpenter. Again, it's not direct evidence, perhaps, but it is at least circumstantial evidence that this payment went through. Another elementary question. Is this Rule 106 issue preserved or not preserved? It is not preserved, Your Honor. Also, when we've got the sidebar between them, and again, the district court comes in and says, the circuit precedent, we can't let it in. It's hearsay. Absolutely. So this is not preserved because Mr. Carpenter received the only relief he requested below, which was multiple uninterrupted opportunities to cross-examine Brett about Jerry's denials of making this payment. But didn't the defense counsel request bringing in these other snippets, at least the other excerpts, where Jerry denied paying him any money at all? He did not, and these were never identified for the district court until the post-verdict motion for a new ruling. Well, it's pretty clear what the defense counsel is saying in the sidebar, what they wanted to bring in. Well, and they were given ample opportunity to cross-examine Brett about those denials, and they took advantage of those, right? I mean, they took advantage of them both before and after this exchange with the district court. The defense counsel elicited concessions that Jerry had repeatedly denied paying Mr. Carpenter during the recorded conversation, that's at ROA 25915, that Brett never saw Jerry pay Mr. Carpenter any money, that's at ROA 25922, that Brett had no confirmation that Jerry passed along to Mr. Carpenter the money Brett had given him for that purpose. Your forfeiture argument, you're not asserting that objections, this wasn't a Haygood objection, this is a Poe objection, that hasn't been your argument? That's not our argument, I don't have a record site for you. And you're not saying that 106 has to be done interruptively if the government directs, you acknowledge the commentary, you can request 106 remainder of tape at the cross-examination stage? Yeah, yes. So the preservation is just that, the non-preservation is that Attorney Poe didn't, I mean, he had sidebar, he does pretty much invoke the rule of completeness, optional completeness. But, but invoking the rule is not enough here because, um, from the outset, the defense strategy was we are going to counter whatever we consider to be misimpressions by the government's excerpts from this recorded conversation through cross-examination. And they were given that opportunity and they took advantage of that opportunity. One thing to elicit it from Brett, the flip for the government, it's another thing to hear the co-defendant himself on tape saying, I never gave him money. Look, I, I absolutely agree with you, Your Honor. And I think that that's a valid criticism of the trial strategy employed by the defendants here. But that is not something that falls on the district court. Oh, but if the district court cut it off and said, sorry, precedent doesn't, I mean, it all stays out. It's pretty apparent, I mean, that they, that they continue to move. They, they risk the hour of the trial judge. I mean, in other words, what else were they supposed to do? Well, respectfully, Your Honor, I, I just don't think there's any evidence in the record that defense counsel was cowed by, by that interaction. I mean, I think, um, you know, we have defense counsel going right back to cross-examining Brett about Jerry's denials. And, you know, this is going to be a little bit, um, a little bit pedantic and I apologize, but I think the tick-tock on this is important. So we have the exchange on the government's hearsay objection at ROA 25917. Then five transcript pages later, ROA 25922 and 23, Jerry's counsel returns to the topic and asks several additional questions about that particular clip and about the surrounding context. Were those, were those all the, because he does go through 609, 621, 622. Are those all the government clips though? Is, was there ever a defense clip that was allowed in? Well, there was never a defense clip that was even identified or proposed or admitted or introduced until the post-verdict motion. So no, Your Honor, there, there was no defense clips that were allowed in. But again, that is a failure of the defense to try to get any of this additional evidence in under Rule 106. And I just want to go back to after this exchange with the district court that, um, my friends on the other side have identified as, you know, the, the place where they purportedly preserved this issue. Defense counsel goes back and he asks Brett several additional questions. He asks Brett about, quote, all these denials Jerry gave him. He gets Brett to concede that he never saw Jerry give Carpenter money. He gets Brett to concede that he never received confirmation that Jerry gave Carpenter any money. And all of that transpires without an objection from the government or intervention from the district court. And then 40 transcript pages later at ROA 25962 and 63, Mr. Carpenter's counsel again returns to the topic and cross-examines Brett further about the clip. So there's just no evidence that anyone at the time understood the district court to be cutting off further inquiry into Jerry. So are you saying any error is harmless? I don't, I don't believe there was an error because again, these requests, the, the two forms of relief that my friends on the other side have identified as being necessary or perhaps compelled by the rule on appeal, they were never presented to the district court. They never asked the district court, let's let in this full two-hour tape. And they never asked the district court, let's let in . . . You know the record excellently. In closing, did attorney, how impaired, restricted was Haygood as to his ability to say, you heard Uncle Jerry never say repeatedly he didn't give money? In other words, can you point to Haygood's closings on behalf of Carpenter where he was able to make the argument that repeatedly he denied giving him money? Do you understand my question? I, I understand what you're asking, Your Honor. I, I don't know if that came up in closing. I'm, I'm happy to look into that for you. But, but again, I mean, I think in order to kind of lay the evidentiary groundwork for that kind of a claim in closing, they would have had to try to do more on the Rule 106 issue. And they didn't. Instead, they just decided to pursue this through cross-examination. The cross-examination was reasonably successful. I mean, they elicited a number of concessions from BRIT, including that . . . But cross-examination of BRIT would be crucial if he's the only one saying there might have been $8,000 going at all remotely near Dr. Carpenter. On the other hand, I haven't seen a case before where a district court in an email says to defense counsel, these are the three questions you get to ask about a guilty plea appeal. Um, you recall the email in this case? I, I do, Your Honor. That's, I've never seen that. You see, have you seen that anywhere in reported case law? That a district court, as to the central issue of a guilty plea, sends an email to defense counsel saying, this is how I want you to ask questions. Your Honor, um, I, I don't have a citation for you. I don't have perfect recall of all that. Because then you end up with this, I mean, it, I was having a really hard time trying to understand, clearly defense counsel was at the sidebar. What was permissible cross based on the plea agreement? Well, Your Honor, I, I think that, um, you know, going to the second issue. Yeah. The district court was, um, you know, kind of trying to navigate between, like, SILA and Charybdis here, right? On the one hand, we really did not want to inform the jury about potential sentencing consequences for the defendants who were on trial. But wouldn't you agree with me as a pretty experienced prosecutor, it's not really SILA and Charybdis. In other words, that concern about confusion is pretty small. When you've got cooperating flips that made millions of dollars, the defense cannot be restricted as to the benefits they got. Uncharged conduct or, you know, and also stat max versus what they end up getting 30, somewhere around 30 months. Well, and the district court allowed cross-examination about the existence of the plea agreements, the terms of the plea agreements, the statutory maxima that they were subject to. Stat max as to uncharged conduct. Stat max as to uncharged conduct, yes, absolutely. You know, in the scripted questions that the district court sent around, it expressly permitted defense counsel to ask— You made a case law the rule of law to be, you get to ask about uncharged conduct and the stat max for the uncharged conduct, but you can never touch guidelines? Is that what you, the government, basically thinks the district court rule is? You know, I think that's a fair reading of Wilson. I have not located, and I don't believe my friends on the other side have pointed to any decision of this court approving discussion of sentencing guidelines for cooperating witnesses. You know, in the cases that we have here and that the district court had before it, Roussel, Restivo, Wilson, sentencing guidelines stay out, but you are able to ask about things like the government's discretion over a 5K benefit. In their reply brief, they say that they were not allowed to ask about stat max for uncharged conduct. Well, I would, again, encourage the court to actually look at the questions that the district court sent around, which said that they could ask whether the cooperators knew the statutory maxima for their uncharged conduct and whether those stat maxes— I mean, those questions do say that, but then when you get to the sidebar, the defense attorney is really struggling because the government keeps objecting, saying, you know our agreement. But can you quote me from the record a cross-examination question that is permitted that says to the Brit, this is what your stat max would have been for the conduct the government could have charged you had you not pled. Did that cross-examination question ever get asked? No, the defense attorney was not allowed to testify as to what the stat max would be for the uncharged conduct. But I think that that is consistent with the case law that even my friends have cited, which says actually the relevant question is what the cooperators understood their benefit to be. And so if the cooperators themselves did not know the statutory maxima of their uncharged conduct, which was what Brit and Matt testified to, then that can't be relevant to, you know, creating an inference of bias. I have two questions you heard is very interested in the juror replacement issue. Yep. You know the Dumas case? Did you ever encounter it? I do not recall reading that in our research here. Again, happy to submit, you know, supplemental letter briefing or something like that if the court would like it. I mean, from the colloquy that I believe Judge Ho you were having with my friend on the other side, it sounds like Dumas is on all fours with the rest of this court's precedent. Which, you know, again, we fully acknowledge, as we did on page 50 of our brief, that this court has stated that prejudice is presumed when the district court discharged a juror without factual support or for a legally irrelevant reason. We don't contest that. But I think the court has also expressly endorsed consideration of the effect of the dismissal and replacement as part of the inquiry into whether the district court abused its discretion. So I think, you know, whether you conceptualize this as a standalone prejudice inquiry or just as, you know, something that goes into the totality of the circumstances that we evaluate when we're assessing whether the district court abused its discretion, this court has looked to the effect of the dismissal. And I'd point to— Well, but there's got to be a finding that the juror is impaired or unable to perform the juror's duties. There wasn't a finding here. Well, Your Honor, I think, you know, I don't know that this court has ever required, you know, kind of magic words for— I'm not talking about magic words. I mean, I'm not talking about magic words. I'm sorry to interrupt you. But, I mean, what we have here is sort of a, well, I would have released this juror the day before, and, voir dire, had she raised the point or, you know, it become clear or what have you, or if I'd gotten the email from her principal. But so, basically, no harm, no foul. I don't know that that's the way the standard works. I mean, there is a difference once the jury is sworn and seated, correct? There's a difference in the sense that the rule applies, right? And prior to the jury being sworn and seated, it's not governed by Rule 24. It's, you know, something that's just kind of committed to the inherent power of the district court. In Dumas, I think the juror was selected but not yet sworn and seated. Does that matter? I don't believe so. I can't imagine— Does the higher standard apply once the juror is selected? I mean, I think to the extent that that makes any sort of difference at all, it just goes to the totality of the circumstances. How deep are we into the trial? How disruptive will this be? Like, is there the potential that, you know, we're going to, like, move below a 12-person jury? All of those kinds of considerations— Well, so, yes, practically speaking. But here we've got no finding. We've got an implicit finding. We know that there was an email from the principal. We don't have the email. We don't know what it said. But when the judge calls in the juror at the end of day one, the juror doesn't say anything in the record at all. The court gives the juror a chance to say something. She doesn't. She's excused. So, there's nothing from the juror saying, no, I agree with my principal. It really would be a hardship. I was scared to say something yesterday. Nothing. And so, we've got to travel on an implicit finding here to avoid presuming prejudice, don't we? Well, Your Honor, I think what we have here is a decision and a clear rationale. And so, you're right. The district court did not say, you know, I hereby and herein find that this juror is unable or disqualified. But how is it a clear rationale when, in the middle of the day, when the email first comes or when they first raise it, the court says, well, I'm going to—the juror's impaired or there's an—unable to perform duties, but I'm going to have her sit because if something happens in the meantime, I'm going to keep her. Sounds like he's finding that she's not impaired or unable to be a juror. Your Honor, I think that there are, you know, varying levels of incapacity. I mean, I think it would be completely—a completely normal use of English for my supervisor to tell a colleague, Josh is unable to handle an emergency filing this week because he's prepping for oral argument. That is inability, right? That being said, like, if this is, you know, a life and death situation, maybe I would still be able to do it. Is there any—I mean, I would think the first question we need to ask is, was there error? And if so, was it prejudicial? Are you disputing that there was error? Yes, absolutely. But that would be—I can't imagine how that rule—we could write that rule because, am I wrong? That would mean anytime there's a third-party request, regardless of the ability or even the agreement of the juror, anytime a third party asks for that juror to be excused, district courts have discretion to just say, fine, we got an alternate? That's the government's position? I don't think that's right. I think that the government's position is that district courts are in the best position to manage jury issues that come up. And they come up in any, you know, innumerable number of factual scenarios. But it doesn't go to competency or ability. So it's directly contrary to 24C1. Your Honor, I disagree with that. I think Rule 24C1 refers to a juror's inability to perform her duties without specification or limitation. And that's why you have cases where jurors are dismissed for what appears to be concerns about the needs. But there's got to be some fact-finding of inability. But, again, I— Can't just be the babysitter has sent a letter saying, I want to go home now. Okay, this alternate jumped in. Right. I think, again, this is a matter that is committed to the district court's discretion. This court has said repeatedly, I recognize there's some perhaps fuzzy language on the prejudice inquiry. But this court has said over and over again, this is a matter committed to the sound discretion of the district court. We will not reverse this kind of an issue unless the district court acted for a frivolous reason or something that is totally out of left field. That was not the case here. The district court applied an equivalent standard in terms of gauging hardship as it did on the day before during voir dire with the support of defense counsel. Defense counsel during voir dire, and look, I recognize we're in a slightly different boat after the jury has been selected and seated than we are during voir dire. But defense counsel said during voir dire, we are worried that jurors who are teachers who are going to be away from their classrooms will be distracted, that they will not be able to pay attention to what's going on here. And the district court says, after it gets this email from the principal, it says, if I had had this information the day before, I would have dismissed her, were on the first day of trial. I'll let both people go. I'm sorry. No, no, no. I like the enthusiasm. I apologize, Your Honor. Thank you. Thank you. We respectfully request that you affirm the judgment below. Thank you. Thank you, Your Honors. I'd love to touch on the recording issue. The juror issue, and briefly on the sentencing issue. First of all, with respect to the recording, I think the friend on the other side said he wasn't really sure what the district court was thinking. I think the best window into what the district court was thinking about the intersection between the hearsay rule and Rule 106 is the very clear ruling the previous day on when this exact issue came up. It's at page 25518-19. I think it's unambiguous that the day before, the trial judge thought that the hearsay rule did not trump 106. That's inconsistent with Portillo. It's inconsistent with Herman. It's just an incorrect statement of law. There's no reason to think that the trial judge just woke up the next morning, had a totally different view of the law, and didn't tell anyone in a way that might have corrected the error the previous day. With respect to preservation, it's not true. It is not correct that we had ample opportunity to explore the questions that we wanted to  The key question is, did we have that opportunity after the sidebar? And the answer is no, because during the sidebar, we said, we want to ask more questions. And when we were fleshing out what we meant by that, we said we want to ask questions that deal with the multiple denials, and the court interrupted us and said no, that's hearsay. So at that point, the line of questioning was shut down, and it's clear that we weren't done asking those questions, because otherwise we wouldn't have raised that as something we wanted to continue exploring. We wouldn't have brought it up in the sidebar. With respect to the juror issue, I still haven't read the Dumas case, and so Judge Ho, I can't go head-to-head with you or toe-to-toe with you on that one just yet, but I understand both from Judge Wilson and from my colleague, Mr. Seamers, that that case did not involve a juror who had conceded. The trial had not been started, the juror had not been sworn in. In that posture, the rule that applies is the rule that governs, you know, pretrial, jurors that have not yet been seated, and there, the standard is much easier to satisfy. It's set forth on page 12 of the Northern District of Texas jury plan, and there's a categorical exclusion there for members of the armed forces, and there are also discretionary exclusions that go far beyond what's allowed once the trial has started. You may see that the court, rightly or wrongly, applies 24C. Okay, I will take a look at that. I think with respect to what the standard is, Your Honor, my friend on the other side said that there's wide discretion, it's got to be frivolous, it's got to be a reason that comes out of left field. That's not the standard. This court is very clear. You have clear text that says unable or disqualified, and then you've got case law that says it requires impairment, and you don't have either of those things here, and we know that not just because of common sense, the juror hadn't said she was impaired, didn't appear to be impaired, because the judge himself said, contemplated that he was going to keep her on the jury. If he was going to keep her on the jury, obviously the judge didn't think she was impaired. There was no implicit finding of impairment. There was an explicit recognition on the record that she could, in fact, stay on the jury if he needed her, and he didn't need her. My friend on the other side expressly urged you to apply the voir dire standard to dismissals that happened during trial. Those are different stages in the case. Supreme Court has recognized that. Different stages in the case, and they have different standards. One set forth in the jury plan. Most of these cases come up in the deliberations context, and most of the sort of revisions to 24 are jurors that are replaced once deliberations, a lot more sensitive. Right. Deliberations is maybe the most sensitive. Then you've got, like, during the trial, pre-deliberation, and then you've got even before the trial started. And the case you said was your strongest, Ramos, that's a pre-deliberations replacement of a juror where the conviction was overturned because there was no finding of inability? Because there was no factual support for the determination that was made, and I forget the details of that determination. So that's what I'll say with respect to the juror issue. And then finally on the sentencing, I think the key point here is a common sense point about fairness. Is that you've got these witnesses, Britt and Matt, who are coming up, they're getting a sweetheart deal. They got 30 months, Your Honor, like very significantly less than what my client got for allegedly getting $8,000 as part of the scheme. They got, they cut a sweetheart deal with the government, and our side of the case wanted to make sure that the jury understood what massive incentives they had to lie. We had to get that in one way or the other. Now we're not trying to be unreasonable. We could have done it if the judge had let us explore the statutory maximum. We could have done it using the sentencing guidelines. But what's wrong is to say you can't talk about any of that. And so that's what the court did. It said sentencing guidelines, categorical rule, sentencing guidelines equals mistrial. That's out. Didn't let us talk about the guidelines. That's wrong. Or it's saying, the case law is saying it's speculative. We don't know how the guidelines will play out. It'll confuse jurors. They don't know how guidelines. So my focus has been on StatMax. Right. You heard him say that he disagrees with your reply brief, that there actually was ever a restriction on StatMax. I want to address that. Let me just, one quick word on the sentencing guidelines. This was not theoretical at all. Literally at the moment this trial was happening, the probation office was issuing the PSR in the Britt and Matt sentencing proceeding. I think it was the day after Juliana Moore was prevented from testifying. The government had every knowledge of what the guidelines range was. This was not a theoretical. Last point on the StatMax. And then, yeah, finally, on the statutory maximum, we were, it's complicated, but I'll try to spell it out very, very quickly. At one point in the trial, the court was waffling back and forth on whether we could get into the numbers. It seemed like he was going to let us do that. Then in that evening, he puts out his email, which has three yes or no questions, which do not, they ask, they let us ask about whether they know about the statutory max. They don't let us get into the numbers. So the next day, Poe comes in and he says, Judge, can I reformulate the question that you've given us? And he reformulates the question, Judge Higginson, in almost the identical way you reformulated it. Can you ask a question that says something like, didn't you know that the statutory max for wire fraud was 20 years? The court considers that. The government says, no, don't let them reformulate it that way. And the judge ultimately says no, and then does not let us get into the numbers, the actual numbers of the statutory max in the actual case. You will study it very closely. Thank you, Your Honors. I appreciate your indulgence. And thank you again for expediting the case. We very much appreciate it. Excellent. Counsel, both sides. Thank you. We appreciate it.  I don't think anybody, opposing counsel, didn't say that you were a liar today.